IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CAROL CHESEMORE, DANIEL DONKLE,
THOMAS GIECK, MARTIN ROBBINS, and
NANNETTE STOFLET, on behalf of themselves,
individually, and on behalf of the CERTIFIED
SUBCLASS in the Matter Known as *Chesemore
v. Alliance Holdings, Inc.*, United States District
Court for the Western District of Wisconsin,
Case No. 09-cv-413,

OPINION AND ORDER

18-cv-724-wmc

                           Plaintiffs,

   v.

DAVID B. FENKELL,

                           Defendant.

---

This satellite lawsuit is an attempt to collect on a judgment for attorney fees awarded to members of a subclass certified in an original, underlying lawsuit, *Chesemore v. Alliance Holdings, Inc.*, Case No. 09-cv-413 (WD Wis.), a long, involved lawsuit arising out of breaches of fiduciary duties under ERISA by the defendant here, David Fenkell, as well as others. Although required to disgorge much of his ill-gotten gains arising out of these breaches, Fenkell has largely, successfully stymied plaintiffs' efforts to date to enforce the remaining judgment for attorney fees entered against him, originally comprising $1,854,008.50 awarded by this court and an additional $223,262.80 awarded by the Seventh Circuit Court of Appeals, plus post-judgment interest as to both. Fenkell has accomplished this despite having personally taken tens of millions of dollars out of Alliance Holdings in salary, consulting fees and stock sales over time, some of which resulted from

his complicated, orchestrated spinoff of certain holdings of Alliance and its ESOP in violation of ERISA.

Virtually all of Fenkell's legal and illegal earnings taken out of Alliance have been converted to "tenancies in the entireties" with his wife Karen or transferred outright to her sole ownership, none of which were challenged in time to be undone under Fed. R. Civ. P. 65 and applicable Pennsylvania statutes of limitation or repose for fraudulent transfers. Indeed, save for what he and his wife posted (and ultimately lost) as a bond to allow his appeal to the Seventh Circuit, and what he was forced to pay under threat of contempt sanctions by this court to satisfy his portion of the underlying, equitable judgment on the merits against all defendants in *Chesemore*, including his wife, plaintiffs have only been able to seize and apply the value of two cars left in David Fenkell's sole name toward his obligation to pay legal fees.

Blocked from collecting any other way (save for an inchoate judgment lien filed by plaintiffs in Pennsylvania, which would only become actionable under that state's rules of tenancy by the entireties should defendant outlive his wife without transferring their indivisible interest to someone else), plaintiffs filed this lawsuit to reclaim moneys belonging solely to him that may have been *incorrectly* characterized upon transfer within the applicable statute of repose as his wife's alone or as "entireties" assets in violation of the Pennsylvania Uniform Fraudulent Transfer Act ("PUFTA"), 12 Pa. Cons. Stat. §§ 5101 et seq.. During motion practice leading up to trial, the court narrowed plaintiffs' claim to two, such post-judgment transfers falling within PUFTA's four-year statute of repose before the filing of this suit on August 31, 2018, *or* one-year from the date the transfer was

2

discovered or could reasonably have been discovered, whichever is later. (Dkt. #97.) On November 2, 2020, the court held a trial to the bench on plaintiffs' remaining PUFTA claim. For the reasons explained below, the court now concludes that transfers arising out of federal tax refunds *did* violate PUFTA, while a settlement payment did not. Accordingly, the court finds in favor of plaintiffs as to the tax refunds and in favor of defendant as to the settlement payment, and will enter a declaratory judgment to that effect.

BACKGROUND[1]

In the late 1990s, defendant David Fenkell as the president, CEO, and sole member of the board of directors of Alliance Holdings, Inc. ("AHI"), as well as the sole trustee of that company's employee stock ownership plan ("Alliance ESOP") developed a niche specialty in buying low and selling high closely-held companies with employee stock ownership plans ("ESOPs"), which were becoming increasingly unmarketable, in part due to changes in the tax laws. More specifically, Alliance and Fenkell would: (1) identify a business ripe for purchase at a discounted price from an owner looking to retire; (2) after purchase, fold that business's ESOP into Alliance's own ESOP; (3) hopefully keep much

---

[1] At various points in this lawsuit, including at trial, the defendant objected to plaintiffs' reliance on facts established against him in *Chesemore*, either because they are arguably irrelevant to this collection suit or must be proved over again. As to the first objection, the defendant is correct, since the essential facts related to the legality of the transfer of specific sums to his wife were not at issue in the previous lawsuit (indeed, some had not yet even occurred), and plaintiffs bear the burden of proving fraudulent transfers under PUFTA. However, the underlying basis for specific facts found material as to the later transfers at issue here are addressed in the opinion section below, where their relevance will be clearer. As to the second objection, both sides actively participated in and are bound by the court's material, factual findings and legal rulings in *Chesemore*, as is Fenkell to facts and violations found against him in *Spear v. Fenkell*, 2016 WL 5661720 (E.D. Penn Sept. 30, 2016). Regardless, the facts set forth in this background section merely provide context to plaintiffs' pending PUFTA claims.

of the current management in place; and (4) then sell off the business itself at a premium over the purchase price, not only to the benefit of the business's former owner and ESOP members, who might still benefit (now as Alliance shareholders through its ESOP), as well as Alliance itself. These transactions proved especially lucrative to David Fenkell himself in the form of salary, the appreciating value of his Alliance shares, consulting fees paid to his related company (DBF Consulting), and other incentives, including the award of phantom stock redeemable by him upon each business's sale.

Consistent with this general business plan, Alliance purchased Trachte Building Systems, Inc. ("Trachte") in a private stock transaction in 2002 for $24 million, merging the Trachte ESOP participants' accounts into the Alliance ESOP. However, at this point, Fenkell and Alliance ran into a problem. As this court found in the parties' original lawsuit, Trachtee's underlying business of building storage units had stagnated, as had its growth prospects. So, after being unable to find an arms-length buyer for that business at a premium over the purchase price, Fenkell instead settled on a complex, highly leveraged, multi-step transaction (the "2007 Transaction") through which: Trachte employees' ESOP accounts that had been merged into the Alliance ESOP were spun off on August 29, 2007, into a new, "Trachte ESOP 2.0"; their Alliance shares in those accounts were exchanged for Trachte shares; and "[u]sing these shares as collateral for loans," new Trachte and Trachte ESOP 2.0 redeemed or purchased all of Trachte's outstanding equity from Alliance, another, related company also in Fenkell's control, and Trachte's original CEO. *Chesemore v. Fenkell*, 886 F. Supp. 2nd 1007, 1013 (W.D. Wis. 2012).

At the close of the 2007 Transaction, therefore, "Trachte ESOP [2.0] had paid $38.1 million for 100% of Trachte's equity and Trachte had taken on $36 million in debt." *Id*. Moreover, this court, and the Seventh Circuit on appeal, found Fenkell and Alliance had "*designed* this transaction so that either plaintiffs' ESOP holdings would be used as leverage to buy Trachte on terms favorable to Alliance or those holdings would revert to holdings in the Alliance ESOP." *Id*.[2] In addition to the some $14 million in profit and fees made by Alliance and Fenkell on the sale of Trachte, after holding it for just five years, David Fenkell received $2,896,100 in phantom stock proceeds in connection with this 2007 Transaction, all of which this court eventually ordered be "restore[d] to Trachte Building Systems, Inc.," after finding Fenkell had breached fiduciary duties in orchestrating the 2007 Transaction to his decided advantage by manipulating captured, Trachte management still beholden to him. *Chesemore v. All. Holdings, Inc.*, No. 09-cv-413-wmc, 2013 WI 6989526 at *6 (W.D. Wis. Oct. 16, 2013). These phantom stock proceeds were deposited into an account held by David Fenkell and his wife Karen Fenkell as tenants in the entireties, which funds and apparently tens of millions more previously held that way from earlier AHI sales, were eventually moved to "an account held solely by his wife." *Chesemore v. All. Holdings, Inc.*, 284 F.R.D. 416, 418 (W.D. Wis. 2012).

After this court found defendants, including David and Karen Fenkell, jointly and severally responsible for plaintiffs' fees and costs under ERISA § 502(g)(1), all defendants

---

[2] A more detailed account of the 11, separate transactional steps devised by defendant Fenkell, grouped into "three baskets," can be found in this court's more expansive description in its opinion cited above, or in the Seventh Circuit's more concise description in *Chesemore v. Fenkell*, 829 F. 3rd 803, 807-11 (7th Cir. 2016).

reached a global settlement as to all claims *except* for David Fenkell, who chose to fight doggedly on through collection efforts in this and Pennsylvania courts and on appeal to the Seventh Circuit. After this nearly global settlement, the court then ordered David Fenkell to: (a) restore $2,044,014.42 to the Alliance ESOP; (b) indemnify several, less culpable co-defendants for any compensatory relief they might be required to pay; and (c) cease serving as a trustee of the Alliance ESOP. Although Fenkell appealed this court's judgment and order, the Seventh Circuit affirmed "in all respects" on July 21, 2016. On January 30, 2017, the Seventh Circuit also ordered David Fenkell to pay plaintiffs an additional $223,263.80 in fees and costs on appeal.

Among the rights that plaintiffs gave up in return for this partial settlement was the explicit right to file a motion for fees and costs in the *Chesemore* litigation against Karen Fenkell ('413; dkt. #849), despite this court's then recent holding that plaintiffs may well have a right to proceed against both David and Karen Fenkell to enforce their judgment (*id*.; dkt. #736), since Karen had obviously been actively involved in her husband's defense, including as it turns out funding much of it through assets transferred to her out of David Fenkell's Alliance earnings without equivalent value in return.[3]

Plaintiffs proceeded to register this court's final judgment against David Fenkell in the Eastern District of Pennsylvania, as well as the judgment of the appellate court

---

[3] In hindsight, knowing most of their assets were transferred to the control of his wife, either solely or as tenancies in the entireties under Pennsylvania law, perhaps David Fenkell felt he was largely playing with "house money" by continuing to hold out personally, although Karen and he went on to pay substantial, additional defense fees only to have the Seventh Circuit uphold all parts of this court's judgment.

awarding additional attorneys' fees against him, and further pursued collection efforts, which have proved largely unsuccessful due to David Fenkell having successfully moved all of his considerable assets (save two vehicles discussed below) into "entireties property" or property in the sole possession of his wife Karen outright, neither of which are any longer challengeable as fraudulent transfers and, therefore, subject to a judgment entered only against defendant David Fenkell.[4] Having also used these same transfer strategies to frustrate collection of his portion of the original judgment awarded to the class action plaintiffs (except to the extent this court used its equitable powers under ERISA to find him in contempt and order a disgorgement), Fenkell now argues in this case that all claims are barred by the applicable statute of repose or latches.

Plaintiffs here are the same individuals and representatives of a certified subclass in the underlying ESOP litigation, who together own a collective judgment for attorneys' fees against defendant David Fenkell in the amount of $2,077,272.30, plus post-judgment interest, and who effectively became his creditors for purposes of PUFTA upon entry of judgment in *Chesemore* on September 8, 2014. Similarly, defendant became plaintiffs' debtor under PUFTA upon the entry of that judgment. Even so, two weeks to the day before trial began in this case, the court granted defendant's "motion for judgment on the

---

[4] As noted already, plaintiffs were able to collect roughly $44,200 from David Fenkell in 2015 in satisfaction of a portion of the judgment by having two vehicles repossessed. After being served with a writ of attachment, David Fenkell apparently voluntarily delivered both vehicles to the U.S. Marshal. Although he testified that the fair market value of the two vehicles was approximately $62,000 based on his "online research" at the time, I have no reason to doubt the value assigned at delivery to the Marshal, and use that valuation for purposes of the current interest calculation. Otherwise, the only remaining assets in David Fenkell's name appear to be retirement funds that he has successfully maintained are similarly exempt from civil execution under Pennsylvania law.

pleadings as to any transfers to his wife preceding August 30, 2014 -- four years before the filing of this lawsuit," or within one year before its discovery by plaintiffs (or when they reasonably should have discovered the transfer). (Dkt. #80.)

Thus, at trial, plaintiffs were limited by the court to seeking to undo fraudulent transfers made within those time frames. As a result of that ruling, the remaining transactions still in dispute were: (1) a series of IRS tax refund checks issued in 2018 to David and Karen Fenkell as joint filers after David was forced to repay millions in previously declared income because of the judgment entered against him in *Chesemore;* and (2) a July 2016 check issued by Squire Sanders for settlement of malpractice claims alleged against it by the Fenkells for professional malpractice in advising David Fenkell on the structure and defense of the 2007 Transaction. Accordingly, the opinion that follows only addresses those claimed fraudulent transfers.

OPINION

At the outset, the court emphasizes what this lawsuit is not about: it is not about defendant's multiple breaches of his fiduciary duties under ERISA, which was established in *Chesemore* and in a separate ruling by E. D. Penn. Magistrate Judge Llorette in *Spear*, 2016 WL 5661720 *16-17; it is also not about the large dividends, stock appreciation and other income that David Fenkell managed to take out of Alliance or its ESOP and transfer to tenancy by the entireties held with his wife or to her outright, which the court has already held is barred from challenge for fraud on creditors by the applicable statutes of limitations, including PUFTA's statute of repose (dkt. #80); and finally, it is not about

8

Karen Fenkell's possible joint liability for the acts of her husband in violations of ERISA (or her helping to finance his defense against plaintiffs' legitimate claims for recovery), which plaintiffs affirmatively released in *Chesemore* in order to reach a global settlement with all other defendants, partially satisfied with funds that the Fenkells claim were by then beyond the reach of creditors. Instead, this lawsuit concerns an attempt at collection of the remainder of the portion of the *Chesemore* judgment that began as $1,809,808.50, and has now reached $1,825,104.70 with post-judgment interest.[5]

This brings the court to its second observation: why plaintiffs' remain here in this court trying to enforce their judgment instead of in a Pennsylvania court and beyond where the bulk of the Fenkells' assets are located. On one hand, the answer is obvious: Pennsylvania property and collection law is remarkably favorable to defendant David Fenkell and his wife Karen, and plaintiffs and their counsel may hope to induce this court to stretch that law given the obvious equities in favor of holding defendant responsible for the full measure of the hard, well-earned judgment entered against him in *Chesemore*. However, that is not the role of this or any court, and the limits of this court's reach to assets in Karen Fenkell's name as a non-party should have been long since manifest.

This brings the court to its final observation: Fenkell's substantial earnings in operating Alliance (both legitimate and ill-gotten), though his alone originally, were

---

[5] While the original amount of attorney fees was adjudged to be $1,854,008.50, plaintiffs' counsel collected roughly $44,200. The remaining amount of $1,809,808.50 plus .10% interest compounded yearly for 8.5 years since judgment was entered equals $1,825,104.70. In addition, defendant Fenkell now owes $234,839.76 in attorneys fees awarded by the Seventh Circuit ($223,263.80 x .82% in compound interest x 6.2 years). Obviously, those rates now substantially favor Fenkell given recent inflationary trends.

intentionally transferred outright to his wife Karen to defeat execution of the *Chesemore* judgment, or co-mingled with other moneys held in tenancy by the entireties with Karen for the same purpose. Since those transfers are now beyond the reach of David Fenkell's creditors, plaintiffs carry the burden of proof to show a subsequent, fraudulent transfer has occurred with in PUFTA's statute of repose. Moreover, where property is transferred in the names of both spouses, creation of a tenancy by the entireties is presumed. *Gilliland v. Gilliland*, 2000 PA Super 96, 751 A.2d 1169 (2000).

I.   **The Tax Refund Checks**

Six of the more recent transfers identified by the plaintiffs as fraudulent are tax refund checks issued by the IRS to "David and Karen Fenkell" in 2018 in response to amended and claw-back returns for tax years 2011 through 2016 in recognition of David's reduced income and losses arising out of the voiding of the 2007 Transaction. These refunds were approved and checks issued as follows:

a.  January 16, 2018, tax refund check from the IRS to David and Karen Fenkell for $103,035.94 (*see* plaintiffs' trial exhibit ("Tr. Ex.") 53 at DBF 59), which was a refund check with interest for tax year 2011 (Trial Tr. (dkt. #108) 69:14-22);

b.  February 9, 2018, tax refund check from the IRS to David and Karen Fenkell for $26,594.60 (Tr. Ex. 53 at DBF 63), which was a refund check with interest for tax year 2013 (*Id*. at 69:23-70:5);

c.  July 8, 2018, tax refund check from the IRS to David and Karen Fenkell for $216,579.55 (Tr. Ex. at DBF 135), which was a refund check with interest for tax year 2012 (*Id*. at 75:24-76:5);

d.  December 31, 2018, tax refund check from the IRS to David and Karen Fenkell for $19,091.94 (Tr. Ex. 53 at DBF 75);

  e. December 31, 2018, tax refund check from the IRS to David and Karen Fenkell for $16,338.72 (Tr. Ex. 53 at DBF 75); and

  f. December 31, 2018, tax refund check from the IRS to David and Karen Fenkell for $390.26 (Tr. Ex. 53 at DBF 75).

Unsurprisingly, defendant argues that the IRS's issuance of each of these tax refund checks in both David and Karen Fenkell's names is dispositive of the question as to whether the proceeds are owned by the Fenkells as tenancy by the entireties, or at least creates that presumption under Pennsylvania law. *Plastipak Packaging, Inc. v. DePasquale*, 2007 PA Super 348, 937 A.2d 1106 (2007); *In re: Popovich's Estate* (No. 2), 3 Pa. D. & C. 4th 140, 1989 WL 65350 (C.P. 1989). Further, even if you looked behind the IRS issuing the refund checks in both names, defendant argues that the evidence is overwhelming as to the basis for those refunds, given that all of the requests for refunds and claw backs were made on behalf of the Fenkells jointly, and the original income tax was paid as a result of their filing of original, joint tax returns.

However, plaintiffs rely on the Third Circuit's decision *In re: Somerset Regional Water Resources, LLC*, 949 F.3d 837 (3rd Cir. 2020), and similar cases, holding that:

> Pennsylvania law is only part of this equation. It is federal tax law that determines who owns what portion of a federal tax refund and how they own it. And federal tax law provides that spouses' ownership of a refund depends on how they owned the income that generated that refund under state property law.

*Id*. at 849. Although the evidence of an intent to defraud is more stark in *Somerset*, the Third Circuit's reasoning is instructive.

In *Somerset*, the Third Circuit joined the Second, Fourth, Fifth, Ninth and Eleventh courts in holding:

> That if the income leading to a tax overpayment belongs to one spouse, then, even if the two file a joint tax return, the refund does not belong jointly to both spouses. *Ragan v. Comm'r*, 135 F.3d 329, 333 (5th Cir. 1998). As Judge Higginbottom explained for th[at] court, "[a] joint income tax return does not create new property interests for the husband or wife in each other's income tax overpayment." *Id*.

949 F.3d at 849; *see also Callaway v. Comm'r*, 231 F.3d 106, 117 (2nd Cir. 2000) ("[T]he filing of a joint return does not have the effect of converting the income of one spouse into the income of another.") (citing *McClelland v. Massinga*, 786 F.2d 1205, 1210 (4th Cir. 1986)); *United States v. Elam*, 112 F.3d 1036, 1038 (9th Cir. 1997) ("a joint tax return . . . does not change the underlying property interests at stake"); *Gordon v. United States*, 757 F.2d 1157, 1160 (11th Cir. 1985) ("Where spouses claim a refund under a joint return, the refund is divided between the spouses, with each receiving a percentage of the refund equivalent to his or her proportion of the withheld tax payments.").

Consistent with the Third Circuit's ruling in *Somerset* and every other federal circuit to date, therefore, the court turns to Pennsylvania property law only to determine the source of the refunded income. 949 F.3d at 850. Here, defendant Fenkell does not dispute that except for a lone, de minimus expense deduction in one of those tax years, all of the amended or claw-back returns reflected in these checks were related to losses caused by Fenkell's having to restore moneys he had wrongfully removed from AHI or its ESOP before or following the 2007 sale of Trachte, or arising out of the cost of litigation in his ultimately unsuccessful defense of that misconduct. More to the point, even more so than in *Somerset*, there is absolutely *no* dispute that the *sole* source of income for each tax year 2011 through 2015 was entirely from David Fenkell's Alliance activities, not from any income generating activities by Karen.

12

This case departs from *Somerset* in one potentially important respect, however, and that is the argument made by defendant that the funds from the 2018 tax checks were subsequently commingled with the Fenkells' now legitimate entireties interests. In fact, unlike in *Somerset*, where the tax refund check was deposited "with the bankruptcy court before they could commingle the proceeds," 949 F.3d at 851, the proceeds from the tax refund checks here were cashed and commingled with the Fenkells' other accounts, most of which are now owned outright by Karen Fenkell or in tenancies by the entireties with David.

This is not to ignore the principle holding by all federal circuit courts to date, in that David Fenkell's act of transfer of his 2018 federal income tax refunds to his wife's sole or their joint ownership in tenancy by the entireties without equivalent value, which rendered him insolvent and intentionally frustrated the plaintiffs' existing rights as a judgment creditor, *was* a fraudulent conveyance in violation of PUFTA and should have been null and void when made, just as in *Somerset*.[6] *See Knoll v. Vku*, 154 A.3d 329, 331-36 (Pa. Super. 2017) (voiding transfer of real estate owned by husband individually to wife without equivalent value in frustration of existing judgment creditor under PUFTA). However, it will be up to another court, preferably in Pennsylvania, to determine if those proceeds should be clawed back from Karen Fenkell, who is *not* a party to this lawsuit, nor

---

[6] Defendant David Fenkell suggests that a portion of the tax proceeds could have been legally transferred to his wife in 2018 given her contributions to the costs of defense in his *Chesemore* and *Spear* lawsuits, but that is so much legal sophistry, since any "repayment" was not only on paper but is offset by the sizable settlement payment made jointly to the Fenkells in July of 2016 by Squire Sanders as discussed next.

subject to direct execution of the remaining *Chesemore* judgment by virtue of plaintiffs' settlement with her.[7]

## II. The Settlement Payment

The other transfer identified by plaintiffs as fraudulent under PUFTA is the payment of $1,950,000 from Squire Sanders to "David and Karen Fenkell" in July of 2016 for settlement of claims against Squire Sanders for professional malpractice in advising David Fenkell on the operation of Alliance and its ESOP through 2012 and the structure of the 2007 Transaction. Without the benefit of a federal tax law, however, the argument for a fraudulent transfer is far less compelling with respect to this settlement payment. To begin, in addition to the fact that the check itself was made out to the Fenkells jointly, triggering the presumption of a payment in tenancy by the entireties, *Gilliland*, 2000 PA Super at 96, the underlying evidence leaves no ambiguity as to Squire Sanders' intent in making out the check to both spouses. In fact, Squire Sanders was insistent not just that David but Karen Fenkell waive any malpractice or other claim either may have against that law firm as their joint clients; and for good reason, since Karen had contributed over 2 million dollars towards payment of David's defense costs, albeit from income once owned outright by David and still under his control.

---

[7] This is not to hold either way that Karen Fenkell should not effectively be bound by this same declaratory judgment, nor required to disgorge income fraudulently transferred by the defendant here.

14

Plaintiffs argue in response that any alleged claim of malpractice was David's alone, since it was Alliance and he who paid for the legal advice giving rise to the Fenkells' claim for malpractice. However, this does not change the nature of the settlement payments directed to both. Indeed, it is only by reliance on other, past transfers from David to Karen Fenkell now falling outside PUFTA's statute of repose that plaintiffs are able to argue Karen should be precluded from claiming a similar right to good legal advice as her spouse. Regardless, plaintiffs have failed to overcome the presumption under Pennsylvania law that the settlement payment was made as a tenancy by the entireties.

ORDER

IT IS HEREBY ORDERED that declaratory judgment be ENTERED as follows:

(1) David Fenkell's transfer of proceeds from his 2018 tax refunds to Karen Fenkell violated PUFTA and is NULL and VOID; and

(2) David Fenkell received the proceeds from Squire Sanders settlement in March of 2016 in tenancy by the entireties with his wife Karen Fenkell under Pennsylvania law.

Entered this 29th day of March, 2023.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge